Good morning, Your Honors, and may it please the Court. I'm Sarah Ullman, representing the plaintiffs' appellants in this case. I'd like to reserve three minutes of my time for rebuttal, please. As you know, Your Honors, this case challenges the National Marine Fisheries Service's decision to authorize the killing of 425 California sea lions at the Bonneville Dam. The agency made this decision pursuant to Section 120 of the Marine Mammal Protection Act, which allows the agency to authorize sea lion killing if sea lions are having a significant negative impact on the decline or recovery of fish. Plaintiffs challenged the agency's decision on three bases. First, the agency violated the Administrative Procedure Act by failing to reconcile its own past decisions, finding that higher levels of take by fishermen and dams has no significant impact. Second, the agency violated the Marine Mammal Protection Act by applying an incorrect legal standard for determining whether sea lion predation is significant. And finally, Your Honors, the agency violated the National Environmental Policy Act for failing to produce an EIS and failing to produce an adequate environmental assessment. Below, the district court denied plaintiffs' summary judgment on these claims, and we're here to appeal that decision. I'll move straight to the merits, Your Honor. There are several problems with the agency's decision in this case, but I think the most obvious is that the agency failed to reconcile this particular decision, that sea lions taking 4 percent of the listed salmonid run in the Columbia River has a significant impact on those listed salmonids, with past decisions where the agency found higher levels of take by fishermen, 5.5 to 17 percent of the listed fish, and dams, 9 percent or 17 percent, depending on which species you're talking about. But these fishery and dam impacts have no significant impact under NEPA, but more importantly, factually, have a minor, if at all, measurable effect. You compare that conclusion with what the agency decided for sea lions, but not only does 4 percent have a measurable effect on salmonid decline and recovery, but in fact a significant one. As I understand the government's argument, they're saying that the standards that were applied in determining whether the impacts were significant were different legal standards, so in that sense you're comparing apples and oranges. But if I understand your position, you're saying it doesn't really matter what standard you apply, it's the numbers that matter, that you can't, whether you're talking about oranges or talking about apples, you can't have somebody saying that 4 percent is significant and 17 percent isn't. Exactly. Is that essentially the core of your argument? Yes, Your Honor, and, you know, yes, MMPA and NEPA both use the term significant, but putting those legal determinations completely aside, within the agency's environmental assessments, it made a series of factual determinations that taking 5.5 to 17 percent by fishermen, this is the harvest environmental assessment that I'm focusing on from 2005, that this had a minimal effect on listed salmonids, had a minor, if at all, measurable effect. And the problem is that facts are stubborn things. No matter if you're considering them under an EA or a biological opinion or a decision under the MMPA, the agency has to, the facts stay the same no matter what statute you're considering them under. At the very least, Your Honor, you're saying we should focus on the end result, that is the number of fish, percentage of fish taken out of this population. You can look across the range, and whatever the legal standard is, the significance is the percentage. It's the impact. Well, yes, Your Honor, the way that the agency analyzed significance for the purposes of the MMPA, it said taking 4 percent of the run by sea lions is significant. Well, that's fine, but you step aside and you look at some of these other decisions that the agency has made throughout the past 10 years. And on hydropower dams, on fisheries, there's a series of decisions, each concluding that the same, if not significantly higher, levels of takes has no impact, particularly on the recovery or decline of fish. So our argument is, yes, this case does involve ESA-listed salmon, and yes, it does involve MMPA-protected sea lions. When it comes down to it, it's just a basic Administrative Procedure Act claim, that the agency has to explain its past precedents. It can't make conflicting factual determinations just depending on whichever decision it's making. Well, you know, it's a subtle argument. They're saying that the determinations that you say are inconsistent were made under different criteria. So the numbers are what they are, but those determinations may have been perfectly legitimate exercises of agency discretion with regard to those other criteria. So really what I think you're saying is they have to look at the facts underlying those determinations. They have to explain why those facts don't matter, that if you're going to say 4% is a significant detrimental impact, then they have to explain, even though these other determinations were made as against different standards, they have to explain how those things interrelate. They can't just ignore them and say, well, that was a different inquiry for a different purpose. Exactly, Your Honor. And yes, under its NEPA determinations, the ultimate legal conclusion is whether it has a significant impact on the environment. But to reach that conclusion, the agency considered a variety of underlying facts. And those underlying facts is what we're arguing the agency needs to explain. Well, they did consider them. They just tended to explain that they didn't really – that they were a result of a different methodology or a different approach. I mean, you're really saying, if this is an APA claim, you're just saying that what they did was arbitrary and capricious because they didn't explain why those other facts didn't matter. Exactly, Your Honor. Yes. And so it doesn't matter how they got those facts or why they got them, but they are in some sense relevant and material to this inquiry, that you have these other sources of salmon being killed, and they're not dealing with them. Exactly, Your Honor. Why, you know, you can take – fishermen can take up to 17 percent of the run. It's going to have not only a minor effect, but the agency concluded, not even a measurable effect. The agency does this decision. It says taking 4 percent is not only measurable, it's a standard that it chose, but also a significant effect. One of the comparators that you use is a 2007 dam take. Was that performed by this agency or a different agency? No, Your Honor, I do want to make clear. It was the Army Corps. It was the Army Corps. Does that make a difference? It should not make a difference. The Corps made its determination and looked through what the different levels of take were and determined that it didn't – let me make sure I have the quote right – that taking 9 percent of adults or 17 percent of adults steelhead meets or exceeds the objectives of doing no harm and contributing to recovery. And, yes, the Corps made that decision. Ultimately, the agency issued a biological opinion based on those determinations, where the agency concluded that there was no jeopardy, so there's no appreciable reduction of survival of the species based on those same facts. So, yes, it was a different agency, but a very closely related agency where the particular agency here is considering those impacts. And the other – particularly the fisheries examples, I think, are even more apples to apples. They are the very same agency considering the very same species and the very same – in the very same river and coming to conflicting conclusions. Nobody's made a determination here that the inquiry about the sea lions doesn't go to survival of the species, does it? It just goes to whether the provisions of the MMPA can be invoked to kill some sea lions. With the salmon, the focus of the whole process is to make sure that the salmon remains a healthy species in this particular watershed, whereas the purpose of the MMPA is different. There's no fear, at least I didn't see it in the record, that if you kill this many sea lions, 425 sea lions, that that's going to threaten the survival of the species. That's correct. Where I live, we've got lots of sea lions. Yes, you're right. Thousands of them. So we want to keep them where he lives. No, I don't mean to make light of it, but I'm just saying that there is a different purpose. There's a different measure being made, and it's not insignificant. It's a different measure. Yes, Your Honor, and I acknowledge it. NEPA and MMPA use the same term. They have to reach the same legal conclusions ultimately. There may be differences between the statutes, but the factual basis that the agency relied on between these two decisions can't conflict. They did an E.S. here. Why did they have to do a – Excuse me? They did an E.A. here. Why did they have to do a – you argue that they have to do a full environmental impact statement. Yes, Your Honor, and I want to make clear we make two arguments. First, that there are significant beneficial and adverse impacts here that require an E.I.S., but second also that the agency's environmental assessment was inadequate because the agency failed to really grapple with what the impacts are here and failed to really consider whether they are significant impacts or not. Yes, there are four reasons why the agency needed to do an E.I.S., at the very least consider these significant impacts. The beneficial impacts, purportedly significant beneficial impacts, that this decision – that removing the sea lions is going to have on listed fish. The recreational impacts, that the agency is potentially removing all of the sea lions at Bonneville Dam and that this could eliminate recreational opportunities that people have locally at the dam. The highly controversial nature of several of the agency's determinations, as well as the impacts to E.S.A. listed threatened stellar sea lions. Our argument is that when you consider all of these together, this is a case where there are questions about what the impacts are. What does sea lion impacts – what does it do to the fish? What will taking away the sea lions – what will that do? Benefits – are they beneficial impacts? Are they adverse impacts? These are the very kinds of decisions that need to be considered fully either in an E.I.S. or at the very least grappled with very seriously in an E.A., which is not something that the agency did in this case. Why don't you save the rest of your time for rebuttal and we'll hear from the government. Thank you, Eric. Mark Hague May it please the court, I'm Mark Hague from the Department of Justice for the federal appellees. Also at council table are Neil Weiss, representing the state of Washington, and Cecil Rennish-Smith, representing the state of Oregon. I will be taking ten minutes and Ms. Rennish-Smith will take five minutes. All right. Section 120 of the Marine Mammal Protection Act reflects Congress's judgment that in some circumstances the protection of endangered and threatened salmonids should trump the protection of healthy populations of seals and sea lions. Section 120 gives NMFS the authority and the discretion to identify those circumstances and this case presents precisely the type of situation that section 120 is intended to address. So we should only look at the Marine Mammal Protection Act. Is that what you're saying? No, Your Honor, and that's not what the agency did. But the standard in the Marine Mammal Protection Act is not equivalent of the standards in the Endangered Species Act or in NEPA. Well, you said that the act signifies that in certain instances sea lions, I mean here you could say that sea lions, that salmon should trump, I mean you used the word trump. Yes. And that's just based on the Marine Mammal Protection Act, correct? Yes, that's correct. That's correct. So irrespective of what the significance determination under NEPA or the ESA, that doesn't relate to the Marine Mammal Protection Act? That's right. They're separate legal standards. Just forget the legal standard. I mean what Congress was up to. That's what your point is? Yes, Your Honor, yes. But I want to be clear about the basis for the agency's decision and explain why the Humane Society's characterization of the decision and the comparison that they're trying to make is unsound. The agency never made a finding in the ESA cases or NEPA cases that the Humane Society cites that a take of 10% or 15% from fishing or hydropower is not significant. All of those decisions are in the fishery management and the hydropower impacts are all managed impacts and they're all mitigated. So when the agency makes an ESA finding that this doesn't result in jeopardy, it's looking not just at the level of the fishery take or hydropower take, but it's looking at the mitigation measures that are being used to offset that take. But aren't the numbers that they're using in comparison after remediation numbers? Some of them are and some of them aren't. Let's take the other to make sure this is what I'm trying to figure out at least. As I understand, after remediation in this case, that is after killing the sea lions, it's a 1% rate, isn't that right? No, Your Honor. I don't think the agency made a determination as to what the survival improvements would be as a result of granting the permit. So they're estimating 4% to 22% or there's a range there. Right. That's how much they're taking, how much the sea lions are taking now. Okay, so now in the 2005 fishery take, which is under NEPA, I understand, the range, as I understand, is 5.5% to 17%. No. And that was before or after remediation? That's before, that's absent the remediation. Yeah. And the take in 2005 was not 5.5% to 17%. In 2005, it was about 8%. Okay, 8%. We'll take 8%. And that's 8% not factoring in remediation. Okay. So that's why... It's still higher than the 4% not factoring in remediation of the sea lions. Yes, it is. But it's lower than 12.6% or 22%, the upper bound estimates of the sea lion take, and there's no mitigation. The sea lions don't mitigate their take, and the sea lion take is not controlled. With the fishery, if the run turns... Where is this all set forth in the opinion, in the decision? The excerpts of record, page 196 and 197, are the clearest, most crystallized discussion... Well, but I have exactly the same question as Judge Fisher does. I mean, there may well be a clear and convincing explanation as to why the numbers don't lead to the conclusion that the Humane Society is advocating, but I didn't see it in the administrative ruling. I think that's sort of the minimal claim they're making, is that the agency has to explain itself. Well, I think at the pages that I just cited... Go to the page. I've got the page. We're all looking at the page with details, so tell us specifically where they make the explanation. So page 196 discusses the level of take by the sea lions, and the range, 3.6 to 12.6, or 22.1%. It also discusses that these numbers are increasing and they're not being controlled, which are important factors. It's not merely the numbers, but that they're not controlled. And then page 197 talks about mortality from the hydropower system and the fishery harvest rates. And it makes the point that, and I'm reading from the next to last paragraph on 197, in contrast to a managed harvest regime, which can reduce mortality in response to decreased run sizes, pinniped predation has the potential to increase even when run sizes are smaller. Magnifying the impact. So... That's true, but how does that say that the rate, whatever the problems are with the sea lions, the percentage numbers are still not any more dramatically impacting the salmonids than these others that are managed. In other words, is the idea that the sea lions somehow are going to increase in population to the point where they're going to wind up taking as much as dams or fisheries, but because they're sea lions and can't be managed otherwise, their percentage could be the same percentage, but it's not controllable. Is that it? Yes, that's part of it. Where do they say that? It says that they're growing. It's that paragraph that I just talked to. It's growing and it does not, and it has the potential to increase even when run sizes are depressed. So the chart of the data that's summarized in the district court decision talks about the number of sea lions present each year, the length of stay, the size of the salmon run. The salmon consumption goes up, even though in a few of those years the runs were much smaller. So there's the potential in a season when the run is very low for the sea lions to take a very high percentage of the run, and you can't control that, whereas you can say to the fishery, we're going to close the fishing season, or you can say to the dam operators, you've got to spill more water. What evidence is there in the record about the potential for increase of the sea lion population? Well, that is set out in the EA. There are sites to it in our brief. There's actually a quite strong record with monitoring data that's been collected over the past 10 years at the dam on the number of sea lions, how long they stay, how many observed. So there's record evidence that shows a steady growth in the number of sea lions? Yes. There's one measure. The total number of individuals at the sea lions peaked in 2003 or 2004 and then has dropped slightly since then, although it's still much higher than it was in 2004. Okay, but what I'm trying... Go ahead. I'm sorry. I'm trying to get a... I'm trying to... What you're saying, I think, is that the percentage attributed to the sea lions is a different kind of number than the percentages that are attributed to the hydropower and the fisheries, because the hydropower and the fisheries are manageable, they're stable, they're knowable, and with the sea lions, you don't have any control over how many salmon they take or how many sea lions there are. That's what I'm hearing. So, okay, that may make sense, but then there's this statement that, and they're growing and it's going to get worse, and what I'm saying is, is that a fear or is there evidence that this is actually happening? There's evidence that that's happening. And that is in the chart showing the sea lion presence at the Bonneville Dam? Yes, and it's explained in the EA and in the decision memo. Okay. Now, I'm still confused then. I'm less confused when I ask the question, but now with the answer I'm still trying to understand its implication. If the dam take or the fisheries take have an impact at X percent, which is higher than the percent that you are attempting to achieve by managing the sea lions by killing them, okay, that's how you're going to control the take by sea lions. You're saying, well, we can shut the flow in the dam or we can regulate the dams or we can close the fishing season. But isn't it the case that the remediated number that results from those managing activities well in excess of the remediation target for sea lions? So you'll control sea lions down to 1 percent, let us say. Where's the evidence that that's the objective for the dams and the fisheries? Is that saying that everybody's going to be treated equally? No, and there's no requirement that everyone be treated equally. Well, why is it significant if the sea lions are taking out, let's say they could be managed to a 4 percent cap by killing fewer sea lions and the fisheries are allowed to continue to operate even though their percentage is 10 percent? Would that be logical? Would that be reasonable? Yes, I think it would be. But why? Because Section 120 specifically reflects Congress's intent that endangered salmon trump healthy populations of sea lions. And the agency, I guess, has a fair bit of discretion as to what comes out of which pot. Yes, exactly, exactly. Can you also say that Congress has made a determination that dams and fishermen trump salmon? Yes, I suppose you could. But what you can say is that Congress gave the agency discretion to decide what is significant. Congress could have said in Section 120, you can't take sea lions unless you have first shut down the fishery or unless the sea lions are having the same level of impact as hydropower or whatever. This is a question of balancing. It's like you have three different sources of salmon destruction and you're saying the agency can say, all right, we're going to target 1 percent for sea lions and 10 percent for fisheries and 10 percent for hydropower and we have discretion to do that. Absolutely, absolutely. And in balancing these numbers again, the 5 percent, 10 percent, that 10 percent number comes along with $100 million a year of mitigation efforts. The sea lions aren't doing any mitigation and the sea lions aren't controlled. So the hydropower system is making up for its impact in ways that the sea lions can't. So the Congress, part of the legislative history, says specifically that it recognizes a variety of factors may contribute to the declines and it says that the levels of protection afforded to seals and sea lions under the Act should not be lifted without first giving careful consideration to other reasons for the decline and to all other available alternatives for mitigation. So your explanation as to what they've done is contained at 196 to 197. It's contained in the entire decision memo, Your Honor. But the – Sum it up. What is the rationale then, just in a capsule wrap-up? The agency, in its Section 7 ESA consultations, looking at the impacts of hydropower and the impacts of the fishery, has imposed significant restrictions on the fishery and on hydropower. And at this point, they're trying to wring out survival improvements in the order of 1 or 2 percent from these systems. At the same time they're doing that, a new threat emerges at the dam. Sea lions show up where they haven't been seen in significant numbers before and they start taking 3 percent, 5 percent, 10 percent of the take. That's a completely uncontrolled source of mortality, whereas you have irrigators, foresters, the hydro system, the fisheries, making significant efforts to limit their impact. And the percentage differences between the takes are within the discretion that is – Absolutely, absolutely. Thank you. Thank you. We used up all of the counsels, but do you have something to add that we haven't already covered? I know you'd like – we've read the briefs, so you can tell me what the panel's interested in, but I'll give you a couple minutes to talk. Traveled all the way here, you know, you might as well. Counsel, Cecil Renish-Smith for the states of Oregon and Washington. I don't have a whole lot to add to what Mr. Haig has already argued, but I think that it is important to point out that it is not as if the agency and the states have not given careful consideration to all the other sources of somonid mortality and decline. In fact, the record is replete, and the citations are throughout our briefs, of course, but with instances of the steps that the state agencies and the federal government have taken to address the other sources of somonid mortality. Yes, the numbers of mortality are still relatively high if all you look at is to match numbers of sea lion predation against hydropower, but then if you look more closely at the numbers and hydropower, for example, much of that mortality are juvenile salmon, smolts. With the sea lions, on the other hand, they are adults who are returning to spawn. Any adult that is killed by the sea lions at the dam is not going to be returning to spawn, thus having greater implications for the recovery of that species. With the fisheries, there is a complex net, so to speak. Is all of this set forth in the decision? I don't want your characterization. I mean, I appreciate it, but what's before us is what's explained in the decision. I left it at my desk, but I believe if you look at page 190 of the excerpt of record, there's some discussion. I may have the wrong page. Hang on. That's the chart. Right. 190 is the chart. Why don't you, if you can find it before we wrap up here, you can pop up and get us the page. Yes, I do know that in the decision there is reference to, and it's not a lengthy discussion, but there is reference to other efforts that have been made to mitigate the impacts. Why don't you take your time to find it for us. Thank you. As I said, before we wrap up, it's that clear you can find it quickly and tell us before we wind up. They're going to get some more time to argue. Thank you. Okay. There are a couple specific points that I'd like to respond to, Your Honor. First, you mentioned the harvest schedule and whether that is the 5.5 to 17 percent numbers before or after remediation or mitigation. I want to emphasize that is after mitigation. Those numbers assume that recreational fishermen who have to toss back fish that don't have the adipose fin clipped. It assumes that fishermen are tossing those fish back. It's assuming all mitigation is applied. 5.5 to 17 percent is what the agency has found. It's a minor, if at all, measurable effect on listed fish. So just to be specific, in this case, what are the apples to apples? Numbers comparisons between this and the fishery take in 2005. The 5.5 to 17 percent of listed fish is what fishermen are ultimately allowed to take. It depends on the run size, yes. But, you know, for example, in 2008, the year that the agency said that sea lions have to be killed because they're having a significant impact, that year the agency has allowed fishermen to take 12 percent based on the run. So, yes, these are completely apples to apples comparisons. I also want to respond to this idea that sea lion predation is growing. And we discussed this in our opposition brief, page 27, note 10. If you actually look at the chart that's on ER 616, it's clear that although it was growing for a while, it has leveled off. There are numerous sites we cited within the record that show that sea lion predation is actually stabilizing at the dam. And the final point I want to make, Your Honor, is the state and the agency's contention is essentially, you know, we've reduced the amount of take that fishermen are allowed and we've reduced the amount of take that hydro systems are allowed. So now it's time for sea lions to give up their turn. They need to give up a little too. But unlike hydro systems and fisheries, the Marine Mammal Protection Act says you can't kill sea lions. You can't take a little from sea lions unless they're having a significant negative impact. So that's what we're looking at here. If it's not significant for fishermen, then it's not significant for marine mammals. And you can't take them under the Marine Mammal Protection Act. What about the qualitative? I'm going to make this a qualitative argument. Is different salmon being taken by the sea lions or salmon at different stages of life? Your Honor, I'd like to address that. Yes, the dams do take about 60 percent of the juveniles. But in addition to 60 percent of the juveniles, they take 9 percent of adult Chinook and 17 percent of adult steelhead. And when we talk about sea lions, yes, we're talking about adult Chinook and adult sea lions. So those are the apples to apples. Do you agree with their ultimate point that even assuming we could get an understanding of the comparable numbers that they, it's within the agency's discretion to decide that the sea lions are subject to more stringent standards than the others as long as they explain why? As long as they explain themselves, yes, Your Honor. If they, it can explain why taking 17 percent is not significant for fishermen, then if they have a good explanation, but yes, they need to explain that. They are right. The MMPA itself doesn't say that they have to eliminate all other mortality, other sources of mortality. Or equalize it. What, excuse me? Or equalize it. Yes. The very least agency has to explain why one is significant, has impacts on recovery, and one doesn't. They need that explanation there, and that's what we're missing in this case. What is the relief you want from this court? We want, Your Honor, to first reverse the judicial court's decision and remand the decision back to the agency. To do what? So it can first put together a full NEPA review. But second of all, to actually explain in detail why sea lions are having a significant effect on recovery, but dams and fishermen are not. Why wouldn't the explanation be the place to start? I mean, why do we have to get into a NEPA review and an EIS if they are able to explain themselves? Why wouldn't a limited remand make more sense? Well, we are, there are two claims here. And yes, it could just be a remand on the MMPA issue for explanation. Or alternatively, ideally both. Okay. Thank you, Your Honor. Thank you. Do we have a second? I would direct the Court to pages 197 and pages 603 of the record. This would be in addition to the pages that are cited in the parties' briefs. But 603 in particular. I won't argue them. Just tell us where they are. Okay. Thanks. Okay. Thank you very much. We appreciate it. It's an interesting case. For Judge Baez and me, as you know, it's deja vu. All right. The case argued is submitted, and we will be in adjournment. Thank you.
judges: Fogel, Fisher, Paez